# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 17-875V
(not to be published)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |
| E.M., *a minor, by his Mother and Natural Guardian*, BRANDY MCCOY, | * * * | |
| | * | Special Master Corcoran |
| Petitioner, | * * | Filed:  October 15, 2018 |
| v. | * * | Decision; Attorney's Fees and Costs; |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * * * | Reasonable Basis. |
| Respondent. | * * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |

*Clifford J. Shoemaker,* Shoemaker, Gentry & Knickelbein, Vienna, VA, for Petitioner.

*Traci R. Patton*, U.S. Dep't of Justice, Washington, DC, for Respondent.

## FINAL ATTORNEY'S FEES AND COSTS DECISION[1]

On June 27, 2017, Brandy McCoy filed a petition seeking compensation under the National Vaccine Injury Compensation Program ("Vaccine Program") on behalf of her minor son, E.M.[2] Petitioner alleged that the human papillomavirus ("HPV") vaccines E.M. received on July 31, 2014, and November 10, 2014, caused him to develop transverse myelitis ("TM") and other injuries. Petition (ECF No. 1) ("Pet.") at 1.

---

[1] Although this Decision has been formally designated "not to be published," it will nevertheless be posted on the Court of Federal Claims's website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the Decision will be available to anyone with access to the internet**. As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the Decision in its present form will be available. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act").

Following the filing of medical records and the Rule 4(c) Report in the case, Petitioner filed a motion to dismiss the case on March 30, 2018 (ECF No. 14). Thereafter, I issued a decision dismissing the case on April 2, 2018 (ECF No. 15).

Petitioner has now filed a motion requesting final attorney's fees and costs, dated September 4, 2018. *See generally* Application for Attorney's Fees and Costs ("Fees App.") (ECF No. 19). Petitioner requests reimbursement of attorney's fees and costs in the total amount of $25,476.31 (representing $24,114.95 for attorney fees, and $1,361.36 for costs), along with $32.74 in personal costs incurred by Petitioner. *Id*. at 1. Respondent contests the appropriateness of any fees award on reasonable basis grounds. Petitioner did not file a reply.

The matter is now ripe for disposition. For the reasons stated below, I find that Petitioner has not established that there was a reasonable basis for her claim. Therefore, I hereby **DENY** Petitioner's motion for attorney's fees and costs.

## Fees Request

According to the billing record submitted with the fees request, Petitioner's counsel began reviewing the case file in March 2016 (over one year prior to filing the claim), and immediately worked to obtain E.M.'s medical records thereafter. *See, e.g.*, Fees App. at 1 (July 8, 2016 entry noting discussion concerning "problems getting records"). Although somewhat vague in description, the billing log reveals that counsel conducted various tasks related to case preparation throughout the remainder of 2016 and early 2017 (including participating in phone conferences with E.M.'s mother, discussing missing materials and records, and monitoring file updates).

The same record reveals that counsel and his associates began reviewing medical records in April 2017 (roughly two months before the case was filed). *See* Fees App. at 2 (April 13, 2017 entry noting counsel reviewed "materials" from mother), 2 (April 19, 2017 entry noting counsel "review[ed] records received to date"), 5 (May 8, 2017 entry noting review of rehab records), 4 (June 14, 2017 entry noting review of neurology records). Based upon my review, it appears that counsel (and his associates) completed over 20 hours of work pertaining to record review during the time period between April and June 2017. *See id.* at 1-5. Counsel filed all relevant records on July 5, 2017 (one week post-filing), and it does not appear that any other records were obtained or filed following that date. *See* ECF Nos. 7-9.

Thereafter, the Joint Statement of Completion was filed on November 17, 2017 (ECF No. 10). Following the filing of Respondent's Rule 4(c) Report, counsel worked to obtain an expert opinion in support of Petitioner's claim, and completed tasks relating to the same. *See id.* at 3 (January 18, 2018 and March 4, 2018 entries noting various emails and calls with Dr. Carlo

2

Tornatore). Additional entries also reveal counsel's work on the matter following Petitioner's dismissal request and my issuance of a Decision thereafter. *See id.* at 3, 6.

Petitioner's fees request asks that her counsel be compensated at a rate of $430 per hour for work performed in 2016; $440 per hour for work completed in 2017; and $450 per hour for work performed in 2018. Fees App. at 7-8. Additionally, Petitioner requests compensation at a rate of $424 per hour for work performed by Ms. Renee Gentry in 2017, with an increase to $435 per hour in 2018. *Id.* Petitioner also requests that counsel's associate, Ms. Sabrina Knickelbein, be compensated at a rate of $378 per hour for work performed in 2017, with an increase to $396 per hour in 2018. *Id.* Pursuant to the General Order No. 9 statement, Petitioner maintains that she has incurred personal costs amounting to $32.74. Fees App. at 1. The fees request also includes litigation costs incurred (representing medical record fees, postage and mailing expenses, photocopy costs, and the filing fee). *Id.* at 7.

Respondent reacted to the fees motion on September 18, 2018, contesting Petitioner's entitlement to a fee award in the entirety on reasonable basis grounds. *See* Response, filed Sept. 18, 2018 (ECF No. 20) ("Response"). In it, Respondent argued that the evidence submitted does not satisfy the Act's reasonable basis standard. *Id.* at 4 (citing *Everett v. Sec'y of Health & Human Servs.*, No 91-1115V, 1992 WL 35863, at *4-5 (Fed. Cl. Spec. Mstr. Feb. 7, 1992) ("To have a 'reasonable basis,' a claim must, at minimum, be supported by medical records or medical opinion.")). Respondent maintains that the present matter lacks objective evidence supporting both E.M.'s alleged injury/diagnosis, as well as, his overall contention that the HPV vaccine caused the symptoms he experienced (given the lack of treater support in the record and the purported long onset between vaccination and symptom occurrence). Response at 6. Petitioner did not file a Reply. The matter is thus ripe for disposition.

**Brief Summary of Relevant Medical Facts**

At the outset, E.M. filed this case seeking compensation for damages related to TM and "other injuries," which he alleged were caused by his receipt of two doses of the HPV vaccine administered on July 31, 2014, and November 10, 2014, respectively. *See* Petition at 1 (ECF No. 1) ("Pet."); Ex. 1 at 1.

Prior to receiving his two doses of the HPV vaccine, E.M. carried multiple preexisting diagnoses. *See, e.g.*, Ex. 2 at 118 (February 11, 2014 notation of morbid obesity, 162 (March 3, 2014 diagnosis of diabetes), 193 (April 17, 2014 consult for depression and anxiety), 113 (February 11, 2014 diagnosis of syncope), 2 (August 20, 2013 record noting history of asthma), 232 (April 29, 2014 diagnosis of acute sinusitis), 193 (April 17, 2014 note listing periodic limb movement disorder or PLMD, parasomnia, obstructive sleep apnea, and hypersomnolence as a current problems), 127 (February 24, 2014 note listing inflammatory bowel disease and overactive

3

bladder in E.M.'s medical history), 24 (September 26, 2013 post-ER treatment concerning concussion from football), 83 (January 7, 2014 treatment for preexisting mid and lower back pain and numbness in hip).

E.M. received his first does of HPV on July 31, 2014, when he was twelve years old. Ex. 1 at 1. No adverse symptoms were noted at the time of vaccination. In the ensuing months, he reported to his primary care physician ("PCP") for various ailments. Ex. 2 at 345-72 (September 3, 2014 treatment for nausea, sore throat, and diarrhea), 379-89 (September 11, 2014 treatment for acute sinusitis), 396-409 (October 13, 2014 treatment for vomiting and abdominal pain); Ex. 4 at 171-72, Ex. 2 at 441-58 (October 27, 2014 hospitalization and treatment for mesenteric adenitis and constipation); Ex. 4 at 212-16 (October 29, 2014 treatment for abdominal pain with possible anxiety trigger), (November 10, 2014 diagnosis of acute pharyngitis). It does not appear that E.M. reported any neurological or vaccine-related problems following his initial dose of HPV.

E.M.'s second dose of the HPV vaccine was administered on November 10, 2014. Ex. 1 at 1. Thereafter, he again sought treatment for various illnesses. *See, e.g.*, Ex. 2 at 2 at 488-99 (December 2, 2014 treatment for pink eye), 502-08 (December 16, 2014 report of a stomach bug), 535-61 (January 12 & 14, 2015 visits for sinusitis, reactive airway disease, school phobia, and GERD); Ex. 3 at 16-18; Ex. 7 at 52; Ex. 4 at 303-08, 585-97, 1277-84 (March 2015 presentations concerning complaints of abdominal pain and treatment for IBS).

On April 2, 2015 (roughly five months following his second dose of HPV), E.M. reported to his GI doctor that "his right leg started going numb on Tuesday around midmorning" and periods of numbness could last from 30-40 minutes or the whole day. Ex. 7 at 96. At a subsequent follow-up visit on April 7, 2015, E.M.'s PCP seemed to relate his symptoms to preexisting obesity, diabetes, and possible SCFE (or aseptic necrosis of the hip). Ex. 2 at 624. One weeks later, on April 14, 2015, E.M. presented to a new PCP and reported a one-month history of "pain radiat[ing] down his right leg" and "right leg . . . numbness and tingling[,]" though no obvious weakness was seen on exam. Ex. 3 at 43-44. E.M.'s new PCP noted a concern for lumbar radiculopathy and referred him to a spine specialist. *Id.* at 44.[3] E.M. also presented to the emergency room in late May 2015, reporting a two-day prior onset of blurry vision and headaches. Ex. 4 at 410-14. He again reported additional lower back pain in August, though it appears he did not report the same type of symptoms experienced in late April. Ex. 3 at 194 (reporting new, non-radicular pain beginning one week prior), 209 (reporting the same and noting pain "not associated with any leg symptoms such as . . . weakness, numbness or tingling"). At this point, it does not appear that any treater opinioned that either HPV dose caused any symptom E.M. was experiencing.

---

[3] Throughout the months of May, June, and July 2015, E.M. also continued to seek treatment for symptoms relating to his ongoing health problems (including sinusitis, sleep apnea, gastroenteritis, abdominal pain, and a muscle strain. *See generally* Ex. 3 at 70-72, 90-92, 132-33, 176-80; Ex. 4 at 379-85.

On September 16, 2015, E.M. presented to the emergency room reporting another episode of new leg weakness with onset 24-48 hours prior to presentation (along with a history of cough and chest pain). Ex. 3 at 357. Following an examination, the ER physician noted that E.M. seemed "wobbly" upon standing and required assistance in moving his legs (i.e. E.M. would "grab[] his own legs and move them"). *Id.* at 357-58. Overall, the treating ER physician found it difficult to assess what weakness E.M. was actually experiencing. *Id.* Nevertheless, encounter notes suggest the ER physician could not rule out progressive neurologic complications such as GBS or TM given his presenting symptoms (and possible pre-presentation viral illness). Ex. 3 at 358; Ex. 4 at 750, 777. Relevant testing conducted during the visit ruled out NMO and MS, and it was noted that a nerve conduction study returned normal results (although the CSF was "borderline elevated"). Ex. 4 at 750, 777-78. MRI imaging of the spine was also normal (apart from a disc bulge). *Id.* at 750. E.M. underwent a psychiatry consult during admission, which noted a concern for possible conversion disorder. *Id.* at 751, 777. He was ultimately treated with solumedrol, and his differential discharge diagnosis included TM, GBS, lower extremity weakness, conversion disorder, and bronchitis. *Id.* at 750, 777. E.M. attended rehab from September 22-30, 2015. Ex. 5 at 2-3.

Thereafter, E.M. continued to follow up with treaters for monitoring of his symptoms, some of which expressed concern regarding the etiology of his extremity weakness. *See, e.g.*, Ex. 3 at 374 (October 5, 2015 neurology follow up noting hospital treated E.M. for TM and bronchitis, but also contemplated conversion disorder); *but see id.* at 585 (noting concern for conversion disorder given E.M.'s normal nerve conduction study results). At a follow-up neurology appointment on October 15, 2015, E.M.'s neurologist opined that he could find no clear cause for his symptoms. Ex. 3 at 585. He further noted a concern for possible conversion disorder as well. Ex. 3 at 585-86.[4]

E.M.'s mother first reported a concern that he may have had a reaction to the HPV vaccine on January 21, 2016. *See* Ex. 3 at 751 (noting mom read an article about a patient diagnosed with a reaction to HPV who displayed symptoms similar to what E.M. was experiencing). E.M.'s PCP referred him to Duke University Health Systems ("Duke Health Systems") (although it does not appear that he opined as to causation). *Id.*; *see also* Ex. 3 at 772 (February 8, 2016 medical note indicating mom filled out a VAERS report). A subsequent note from E.M.'s neurologist on February 9, 2016, indicated that his mother reported he was being evaluated for "post immunization disorder possibly from HPV." *Id.* at 945. During that visit, however, E.M.'s neurologist again reported a belief that his symptoms were attributable to conversion disorder. *Id.* at 946. He also opined that a post-immunization injury would likely cause some organic injury (which he suspected E.M. did not have). *Id.* Normal reflexes, tone, bulk, and nerve conduction

---

[4] E.M. continued to complain of leg weakness and other ailments through the remainder of the year. *See, e.g.*, Ex. 3 at 460 (October 21, 2015 PCP visit noting use of a cane), 680 (December 2, 2015 ER visit for headaches, but noting use of wheelchair given lower extremity weakness); *but see id.* at 715 (December 29, 2015 PCP visit for sinus infection, but making no mention of leg weakness).

studies were noted. *Id.*

On March 17, 2016, E.M. presented to an allergist/immunologist at Duke for an immunity workup. Ex. 6 at 6-21. His health history at this time included a TM diagnosis following hospitalization and a reported concern of an HPV vaccine-induced injury (although it appears E.M.'s treater did not have access to his hospital records upon exam). *Id.* at 8 ("mom notes that [E.M.] received HPV vaccine . . . wonders if this vaccine is related"). Relevant testing showed no concern for immune deficiency, but E.M. was nevertheless referred to Duke's Clinical Vaccine Unit ("Vaccine Unit") for an evaluation relating to his HPV concerns. *Id.* at 8-10. Clinicians with Vaccine Unit noted that E.M.'s mother reported an onset of fatigue and clumsiness "within a few days" following his initial dose of HPV—contrary to what the medical records actually show—and bilateral lower extremity weakness in September 2015 (though impression notes indicate a "9-month history of bilateral leg weakness"). *Id.* at 23-24, 25. Upon evaluation, E.M.'s treater acknowledged that onset of TM following administration of the HPV vaccine had been reported in the literature, though she deemed a reaction "very unlikely" as the theoretical biological probability for development of TM is believed to be "4 days to 6 weeks after vaccine exposure." *Id.* at 25. The Vaccine Unit also submitted a VAERS report given E.M.'s health course. *Id.* at 26 ("we reported [E.M.'s] case, including the details regarding timing of vaccine administration and the onset of his neurological symptoms to . . . [VAERS] on 4/22"). A follow-up visit in May revealed a similar conclusion. Ex. 3 at 1043 (noting Vaccine Unit felt prolonged, 6-month duration between vaccination and symptom onset made a vaccine injury "very unlikely").

While at Duke Health Systems, E.M. was evaluated by a neurologist and rheumatologist, both of whom questioned his TM diagnosis. E.M.'s treating neurologist at the time concluded that his TM workup (including normal lumbar puncture, MRI imaging, and CSF analysis) suggested he did not meet the clinical criteria for TM, though treaters also recommended he receive a more thorough inflammatory/autoimmune evaluation to rule out any "underlying TM mimicker[,]" as E.M. did not have full receive full spinal imaging during his initial hospital course. *See* Ex. 6 at 50 (also suggesting "non-organic underlying etiology" such as psychological disorder); *see also* Ex. 4 at 917 (May 2016 ER visit note indicating TM was a working diagnosis despite the lack of negative lab workups and also that conversion disorder could be possible). E.M.'s rheumatologist at Duke opined that his leg weakness had been "diagnosed" as a conversion disorder, and she also found no evidence of past or present TM in his health record. Ex. 3 at 1079. E.M.'s vaccination was discussed during this consult as well, though the treating rheumatologist believed E.M. "was fixated on the HPV causing these symptoms[,]" despite the lack of confirming TM evidence. *Id.* (also noting treater could not opine as to vaccine causation). Notes during this consultation also indicate that E.M.'s mother reported an onset of adverse symptoms between two to six weeks following vaccine administration. *Id.*

The remainder of E.M.'s medical records (detailing medical visits from May 2016 through

May 2017) show he continued to seek treatment for his leg weakness as well as other chronic problems. *See, e.g.*, Ex. 6 at 239-42 (July 19, 2016 orthopedic consult for leg weakness); Ex. 3 at 1195-96 (August 23, 2016 wellness exam noting improving leg weakness and back pain); Ex. 3 at 1228, 1257 (September 13 & 16, 2016 treatments for URI, sinusitis, and fever); Ex. 3 at 1103 (October 5, 2016 appointment noting continued leg tingling and back pain); Ex. 4 at 935-40 (October 11-17, 2016 hospitalization for migraines); Ex. 8 at 32-52 (November 17, 2016 neurology follow up concerning migraines); Ex. 8 at 93 (December 15, 2016 neurology follow up for migraines and leg tingling); Ex. 4 at 1258-67 (February 3-11, 2017 hospitalization for migraines fever, and pneumonia); Ex. 3 at 1596-1604 (March 28, 2017 PCP visit for viral illness); Ex. 8 at 230-35 (April 25, 2017 neurology follow up for migraines and continued lower extremity tingling); Ex. 4 at 1773-75 (May 7-11, 2017 hospitalization for back pain and leg weakness). At times, subsequent treaters continued to opine that E.M.'s chronic problems could include a psychological component and that his leg weakness could be attributable to an alternate cause. *See, e.g.*, Ex. 8 at 230-35 (April 25, 2017 neurology follow up relating leg tingling to migraines); Ex. 4 at 1773-75 (May 7-11, 2017 hospital note referencing "h/o leg weakness with conversion disorder in past"), 1773-75 (noting leg weakness attributable to deconditioning and muscle tightness).

## ANALYSIS

### I. Reasonable Basis Standard

#### A. *Relevant Legal Standards*

I have in prior decisions set forth at length the criteria to be applied when determining if a claim possessed "reasonable basis"[5] sufficient for a fees award. *See, e.g.*, *Allicock v. Sec'y of Health & Human Servs.*, No. 15-485V, 2016 WL 3571906, at *4-5 (Fed. Cl. Spec. Mstr. May 26, 2016), *aff'd on other grounds*, 128 Fed. Cl. 724 (2016); *Gonzalez v. Sec'y of Health & Human Servs.*, No. 14-1072V, 2015 WL 10435023, at *5-6 (Fed. Cl. Spec. Mstr. Nov. 10, 2015). In short, a petitioner can receive a fees award even if his claim fails, but to do so he must demonstrate the claim's reasonable basis through some objective evidentiary showing and in light of the "totality of the circumstances," including all facts relevant to the to the case. *See Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 286 (2014) (citing *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 303, 303 (2011)). The nature and extent of an attorney's investigation into the claim's underpinnings, both before and after filing, shed light on the extent of objective evidence supporting a claim. *See Cortez v. Sec'y of Health & Human Servs.*, No. 09-176V, 2014

---

[5] Although good faith is one of the two criteria that an unsuccessful petitioner requesting a fees award must satisfy, it is an easily-met one – and Respondent does not appear to question it in this case. *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996) (in the absence of evidence of bad faith, special master was justified in presuming the existence of good faith).

WL 1604002, at *6 (Fed. Cl. Spec. Mstr. Mar. 26, 2014); *Di Roma v. Sec'y of Health & Human Servs.*, No. 90–3277V, 1993 WL 496981, at *2 (Fed. Cl. Spec. Mstr. Nov. 18, 1993) (citing *Lamb v. Sec'y of Health & Human Servs.*, 24 Cl. Ct. 255, 258–59 (1991)). Program attorneys are expected to conduct a reasonable pre-filing investigation—including an evaluation of the factual basis for the claim at minimum. *See Allicock*, 2016 WL 3571906, at *4; *Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *7 (Fed. Cl. Spec. Mstr. Nov. 30, 2007) ("[a] reasonable pre-filing inquiry involves an investigation of the factual basis for a Program claim *or* the medical support for a vaccine petition") (emphasis added)).

The Court of Federal Claims recently provided further illumination as to the standards that should be used to evaluate whether the totality of the circumstances warrant a finding that reasonable basis existed. *Cottingham v. Sec'y of Health & Human Servs.,* No. 15-1291V, 2017 WL 4546579, at *10 (Fed. Cl. Oct. 12, 2017). As Judge Williams therein stated, a special master should consider "the novelty of the vaccine, scientific understanding of the vaccine and its potential consequences, the availability of experts and medical literature, and the time frame counsel has to investigate and prepare the claim." *Id*. at *5. An impending statute of limitations deadline, however, has been removed from consideration under the "totality of the circumstances" analysis. *See Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 636 (Fed, Cir. 2017); *see also Amankwaa v. Sec'y of Health & Human Servs.*, No. 17-036V, slip. op. at 9-10 (Fed Cl. June 4, 2018) ("special masters must not consider subjective factors in determining whether a claim has reasonable basis[,]" and should "limit [their] review to the claim alleged in the petition . . . based on the materials submitted.") (quoting *Santacroce v. Sec'y of Health & Human Servs.*, No. 15-555V, 2018 WL 405121, at *7 (Fed. Cl. Spec. Mstr. Jan. 5, 2018)).

### *B. Petitioner's Claim Lacks Reasonable Basis for a Fees Award*

Respondent contends that Petitioner's allegations of a vaccine-induced injury amount to "no more than 'the claim's of petitioner alone, unsubstantiated by medical record or medical opinion.'" (citing 42 U.S.C. § 300aa-13(a)(1)). Response at 6. Specifically, Respondent claims that there is insufficient objective evidence in the record supporting Petitioner's claim that E.M. experienced an HPV vaccine-induced TM injury given the length of onset between vaccine administration and symptom onset and the overall lack of treater support for the injury alleged. *Id.* at 6-7. A careful review of the medical record and other submitted information confirms Respondent's assertions.

In particular, the contemporaneous medical records do not support the conclusion that either of the two doses of HPV E.M. received caused any of his alleged adverse symptoms. None of his treating physicians appear to have attributed the vaccinations he received as playing a part in his health issues. For example, E.M.'s treating allergist/immunologist at Duke Health Systems

8

deemed a reaction to the HPV vaccine "very unlikely" given the long duration between vaccine administration and symptom onset. *See* Ex. 6 at 25 (onset of TM "is believed to be 4 days to 6 weeks after vaccine exposure" based on reported literature); Ex. 3 at 1043 (follow-up visit noting the same conclusion). E.M.'s treating neurologist similarly questioned assertions that he experienced a vaccine injury given the lack of support for an "organic" (i.e. manifesting as physical as opposed to mental) injury in the record. Ex. 3 at 945-46 (instead relating E.M.'s symptoms to conversion disorder). Moreover, E.M.'s rheumatologist referenced a reported concern for a vaccine-induced injury during consultation, but notes from that visit indicated the treater could not opine regarding any causal connection between the HPV vaccinations and the alleged injury. *See* Ex. 3 at 1079.

Further cutting against a finding of reasonable basis is the long gap between E.M.'s vaccine doses and the alleged onset of symptoms. I note that the medical records filed in support of Petitioner's claim establish that E.M.'s symptom onset (at best) occurred roughly five to six months after his *second* dose of the HPV vaccine. *See* Ex. 7 at 96-106 (April 2, 2015 reporting a concern for leg numbness a few days prior); Ex. 3 at 43 (April 15, 2015 concern for continued leg numbness and tingling with onset one-month prior). The record suggests E.M. also reported leg pain the following August (with new onset one week prior), though it was not associated with the weakness or tingling he experienced in April. *See* Ex. 3 at 194. Subsequent treaters placed onset of symptoms roughly six months following his second vaccine dose (closer-in-time to his ER presentation in September). *See* Ex. 3 at 1043 (noting six-month duration between vaccine dose and onset made vaccine injury unlikely); Ex. 6 at 23-25 (noting onset of bilateral lower extremity weakness in September 2015 and opining that adverse reaction in that timeframe would very unlikely).

Although a longer-alleged symptom onset does not automatically negate reasonable basis, Program precedent strongly suggests that TM is an acute disease categorized by an abrupt onset of motor and autonomic dysfunction. Most cases involving claims of vaccine induced-TM (in keeping with its acute nature) resulting in a successful entitlement decision involve a far shorter timeframe. *See, e.g.*, *Raymo v. Sec'y of Health & Human Servs.*, No. 11-0654V, 2014 WL 1092274 (Fed. Cl. Spec. Mstr. Feb. 24, 2014) (onset of TM three to four days after receipt of Tdap vaccine); *Moore v. Sec'y of Health & Human Servs.*, No. 07-0645V, 2010 WL 5113199 (Fed. Cl. Spec. Mstr. Aug. 31, 2010) (onset of TM 24 hours after receipt of influenza vaccine); *Schmidt v. Sec'y of Health & Human Servs.,* No. 07-20V, 2009 WL 5196169 (Fed. Cl. Spec. Mstr. Dec. 17, 2009) (onset of TM 27 days after receiving influenza vaccine). Based on a review of the current case law, it does not appear that any special master has found in favor of a vaccine-induced TM injury more than two months following vaccine administration. *See, e.g.*, *Pecorella v. Sec'y of Health & Human Servs.*, No. 04-1781, 2008 WL 4447607 (Fed. Cl. Spec. Mstr. Sept. 17, 2008) (hepatitis B vaccine; two months prior to onset of TM); *but see Farley v. Sec'y of Health & Human Servs.,* No.

13-683V, 2015 WL 5031989 (Fed. Cl. Spec. Mstr. July 31, 2015) (dismissing claim alleging vaccine-induced TM with three-month onset); *Lopez v. Sec'y of Health & Human Servs.*, No. 14-270V, 2014 WL 2584436 (Fed. Cl. Spec. Mstr. May 20, 2014) (same).

Admittedly, the record <u>does</u> indicate that E.M.'s allergist/immunologist submitted a VAERS report concerning his overall course following vaccination. *See* Ex. 6 at 26. Notably, during that same visit, however, the same treater opined that an HPV vaccine-induced TM injury would be "very unlikely" under the present facts given the lengthy duration between vaccine administration and symptom onset. *Id.* It is otherwise well established in the Program that VAERS data is not persuasive with regard to any causal connection between vaccination and injury, and petitioners cannot rely on such to establish reasonable basis for a claim. *See, e.g.*, *Carda v. Sec'y of Health & Human Servs.*, No. 14-191V, 2017 WL 6887368, at *23 (Fed. Cl. Spec. Mstr. Nov. 16, 2017). And apart from the visit notes from treaters at Duke Health Systems (generally opining the vaccine played no role in E.M.'s symptoms), no other records submitted casually opine that the HPV doses caused him any harm.

The record also contains some dispute concerning E.M.'s proper diagnosis both during and following his hospital stay and treatment for TM in mid-September 2015. Various treatment records at the time of hospitalization suggest that E.M. was diagnosed with TM. *See* Ex. 4 at 750 (pediatric consult noting discharge diagnosis included TM); Ex. 3 at 358 (ER encounter notes suggesting treaters could not rule out neurologic complications, including GBS or TM, given his presenting symptoms). Those same records, however, included differential diagnoses including TM, GBS, or possible conversion disorder. *See* Ex. 4 at 777 (detailing neurology consult). Moreover, multiple of E.M.'s treaters indicated in their respective impression notes that the relevant medical testing conducted could <u>not</u> explain the extremity weakness and tingling he was experiencing. *See, e.g.*, Ex. 4 at 750, 777-78 (noting nerve conduction study, lumbar puncture, and MRI all revealed no abnormality); Ex. 6 at 50 (again noting lumbar puncture, MRI, and CSF were normal); Ex. 3 at 1079 (finding no evidence of past or present TM). In addition, the relevant medical record contains statements by subsequent physicians opining that E.M.'s symptoms could be related to conversion disorder or some other unknown etiology. *See, e.g.*, Ex. 3 at 585-86, 1079; Ex. 6 at 50; Ex. 8 at 230-35; Ex. 4 at 1773-75.

Based on my own review, it does not appear the E.M.'s treaters affirmatively concluded that his symptoms were compatible with the onset of an acute, neurologic impairment (such as TM). Thus, even if the timeframe from vaccination to injury were closer, the nature of the injury *itself* fails the objective evidence test. Petitioner would not be able on the present record to establish TM as the injury, and she also would not be able to explain why E.M.'s preexisting symptoms and condition were not related to his post-vaccination condition. This, in conjunction with the glaring timeframe problem, establishes that this case lacked reasonable basis.

Petitioner's counsel are extremely experienced Vaccine Program litigators. An examination of the record reveals that they began examining the case file and requesting records almost one year prior to filing the claim, and completed over 20 hours of record review prior to filing. They had ample time to learn of the long gap between E.M.'s vaccinations and his onset of symptoms (at best over five months following vaccination), as well as understand the legitimate questions as to the nature of his alleged injury. Even a cursory review of the records would have reasonably informed counsel that the temporal relationship between E.M.'s vaccinations and his claimed injury would be a major hurdle to overcome. Overall, there is no persuasive evidence in the medical records which indicates that E.M.'s vaccinations caused him any harm, or that any treater opined that the symptoms he experienced were attributable to his vaccinations. Counsel could have reached this determination without filing the claim.

In sum, the totality of the circumstances reflects that the record is devoid of objective support for the claim's reasonable basis.

## CONCLUSION

For all of the reasons stated above, I conclude that Petitioner has failed to establish that there was a reasonable basis for the claim for which the petition was brought. Accordingly, I find that an award of attorney's fees and costs to Petitioner is unreasonable, and her motion is **DENIED**. In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the Court is directed to enter judgment herewith.[6]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Special Master

---

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the Parties' joint filing of notice renouncing the right to seek review.